Steven L. ZIMMERMAN, Trustee of Center of Hope Foundation, Inc., Center of Hope Hope Church, Inc., Center of Hope Enterprises, Inc., and Center of Hope Retirement Center, Inc., Colorado corporation,

v.

The BOARD OF PUBLICATIONS OF the CHRISTIAN REFORMED CHURCH, INC., The Christian Reformed Church, Inc., The Christian Reformed Church in North America, Inc., Andrew Kuyvenhoven, and Sandra L. Vander Zicht.

Civ. A. No. 83-JM-211.

United States District Court,
D. Colorado.

Dec. 7, 1984.

Huntington C. Brown, Mark Lewis, Brown & Lewis, Denver, Colo., for plaintiff.

Thomas B. Kelley, Cooper & Kelley, P.C., Denver, Colo., for Bd. of Publications of the Christian Reformed Church, Inc., Andrew Kuyvenhoven, and Sandra L. Vander-Zicht.

Fredric A. Ritsema, Arthur R. Karstaedt III, Hall & Evans, Denver, Colo., for the Christian Reformed Church in North America.

## ORDER

JOHN P. MOORE, District Judge.

This matter is before me on defendants' motion for summary judgment. Plaintiff's complaint asserts claims in contract, for violation of the antitrust laws, and for libel. Defendants seek summary judgment on all three of plaintiff's claims. The issues raised here have been fully briefed and the matter is ripe for determination. Jurisdiction is based on 28 U.S.C. § 1332 as well as § 1331.

Plaintiff is the trustee in bankruptcy for Center of Hope Church (COH) and three affiliated organizations, Center of Hope

Foundation, Center of Hope Retirement Center, Inc. and Center of Hope Enterprises, Inc. Defendants are the Christian Reformed Church in North America, Inc. (CRCNA); the Board of Publications of the Christian Reformed Church, Inc.; Andrew Kuyvenhoven, editor of *The Banner* a weekly religious news magazine published by the defendant Board of Publications of the Christian Reformed Church, Inc.; and Sandra L. Vander Zicht, assistant editor of *The Banner*.

The complaint arises out of two separate incidents. The first occurred during August and September 1980 when the defendant Board of Publications imposed conditions on the further publication in *The Banner* of advertisements in which the Center of Hope solicited the purchase of unsecured promissory notes. Plaintiff's first and second claims for relief arise out of this incident, and are against the Board of Publications and the Christian Reformed Church. Plaintiff alleges that the Board's refusal to continue publication of the promissory note advertisements gives rise to claims for breach of contract (first claim for relief) and also violates sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 (1982), and Colo.Rev.Stat. § 6–4–101 (second claim for relief).

The second incident occurred on February 8, 1982 when *The Banner* published an article entitled "Former C.R.C. Complex in Trouble," and concerning the Center of Hope Church and its affiliates. With respect to the February 8, 1982 article, plaintiff has brought a defamation claim against the Board and the journalist, Vander Zicht, who wrote the article as well as the editor, Kuyvenhoven, who allowed the article to be published (third claim for relief).

Plaintiff in his fourth claim for relief alleges that defendants' conduct, in both incidents, was outrageous and that such "outrageous conduct" entitles plaintiff to compensatory as well as exemplary damages. Plaintiff's fourth claim for relief was dismissed as to the defendant CRCNA on the ground that, under Colorado law, the plaintiff corporations are incapable of

suffering the "severe emotional distress" necessary to establish the tort of outrageous conduct. *Zimmerman v. Board*, Minute Order dated September 16, 1983. The other defendants now ask that plaintiff's fourth claim for relief be dismissed as to them.

I.

The Center of Hope Church was previously known as Fairview Christian Reformed Church. In early 1973, Rev. Al Haan became its pastor. By 1979 Fairview's name had been changed to the "Center of Hope"; it had purchased twelve acres of land in Westminster, Colorado; built a church and two other multipurpose structures on the property; and had begun several capital producing programs, including day care centers, bookstores, employment agencies, and the marketing of energy saving devices. To accomplish these ambitious goals, three affiliated corporations were created: Center of Hope Foundation, Center of Hope Enterprises, and the Center of Hope Retirement Center. The Center of Hope Foundation, a Colorado not-for-profit corporation, was created to administer the Church's business and fund raising activities. Center of Hope Enterprises, Inc., a Colorado for-profit corporation, was created to operate the capital producing programs mentioned above. Lastly, Center of Hope Retirement Center, Inc., was established to develop a retirement home on church property.

The Center of Hope Church and its affiliated organizations raised the capital needed to finance their activities through a method of financing that had become popular within the Christian Reformed Church: the running of advertisements for unsecured promissory notes in the CRCNA magazine, *The Banner*. The Center of Hope and the Center of Hope Foundation placed promissory note advertisements for publication in *The Banner* from 1974 until August 1980. The advertisements contained a general description of the Center of Hope's church buildings and church related activities, and indicated what rate of

interest would be paid on funds invested. According to Rev. Haan, the Center of Hope organizations raised close to three million dollars from the selling of promissory notes during this period.

During July and August, 1980, *The Banner* received copy for two promissory note advertisements, one from Center of Hope Enterprises offering a "dry-vent heat retriever," and the other from the Center of Hope Foundation announcing the opening of several Center of Hope Family Centers. These ads were never published. Instead, on August 12, 1980, A. James Heynan, executive director of the defendant Board of Publications of the CRCNA, sent a letter to Rev. Haan indicating that he was declining to publish both ads on the ground that he felt that publication of these advertisements might impinge on the integrity of *The Banner.*

The August 12, 1980 letter provided that Mr. Heynan would reconsider his decision not to publish these ads if sufficient corporate and financial documentation were forwarded to him, and this material alleviated his fears as to the financial stability of the Center of Hope. The letter also provided that Mr. Heynan's decision could be appealed, in writing, to the President of the Board of Publications, Rev. Alvin Hoksbergen.

In response to Mr. Heynan's letter, several actions were undertaken on behalf of the Center of Hope. Reverend Haan sent a lengthy undated letter to the Board of Publications explaining the "workings" of his church. Les Kaemingk, attorney for COH, sent a letter to the Board, dated August 21, 1980, which explained the Center of Hope's corporate structure. On August 26, 1980 COH's CPA, George W. Whitley, sent Mr. Heynan a letter stating that his firm had prepared "unaudited" financial statements for the Center of Hope through April 30, 1979 and that his firm had been retained to prepare "unaudited" statements as of August 31, 1980. Further, COH requested a meeting with the Board of Publications. That meeting was set for September 15, 1980.

Following these actions by COH, on August 26, 1980 Heynan again wrote Haan (COH) expressing his continued concern over *The Banner's* obligation to its readers and, more specifically, that the advertisements tendered by the Center of Hope might be misleading. Heynan's August 26, 1980 letter stated that pending the September 15, 1980 meeting, Center of Hope's promissory note ads would be kept out of *The Banner.* Heynan also reassured Haan that his decision was not a final one.

On September 15, 1980, Haan and four other representatives met with six members of the Board of Publications and National Church in Grand Rapids, Michigan. Nothing seems to have been resolved at this meeting. Following the meeting, Heynan again wrote to Haan requesting that the Center of Hope's financial information be forwarded to *The Banner.* In response, on September 24, 1980, Haan wrote back to Heynan stating that it was the decision of the Center of Hope Church Board that it would "withdraw from any additional discussion of the matter." Haan's letter made clear that COH recognized that *The Banner* would be permanently closed to COH promissory note advertisements.

## II

Plaintiff in his first claim for relief argues the cessation of publication of plaintiff's promissory note advertisements in *The Banner* constituted a breach of contract. To support his claim that a long term contract to publish its ads existed between COH and the defendant Board of Publications, plaintiff relies on four contract theories: implied contract, constructive contract, promissory estoppel, and breach of fiduciary duty.

The law applicable to plaintiff's contract claims must be determined under Colorado choice of law principles. *Klaxon v. Stentor Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Vandeventer v. Four Corners Elec. Co.,* 663 F.2d 1016 (10th Cir.1981). Colorado has adopted the *Restatement (Second) of*

*Conflicts of Laws* approach for contract actions, with its "most significant relationship test." *Wood Bros. Homes, Inc. v. Walker Adj. Bureau,* 198 Colo. 444, 601 P.2d 1369 (1979); *First National Bank in Fort Collins v. Rostek,* 182 Colo. 437, 514 P.2d 314 (1973). Applying the "most significant relationship test" and the principles stated in §§ 188 and 196 of the Restatement, it would appear that Michigan law controls. In the case of a service contract, the law of the state where service is to be performed governs. *Restatement (Second) of Conflicts of Laws,* § 196 (1969). The complaint alleges that a service contract existed, and that the contract resulted from conduct which occurred and which was to be performed in Michigan, where *The Banner* is published. Therefore, plaintiff's contractual claims will be analyzed under Michigan law.

Under Rule 56, Fed.R.Civ.P., the moving party is entitled to judgment as a matter of law only if no genuine issue of any material fact is presented. Thus, if plaintiff has raised a genuine issue of material fact as to his contract claims, I must deny defendants' summary judgment motion relating to these contract claims.

Defendants contend that plaintiff's contract claims do not present a genuine issue of material fact. I agree. While the complaint raises the question of whether some sort of contractual relationship existed between the Center of Hope and the Board of Publications for publication of the Center of Hope's advertisements in *The Banner,* the supporting and opposing affidavits and depositions make clear that no genuine issue of material fact is presented as to the existence of such a contractual relationship. Summary judgment is appropriate even though an issue may be raised formally by the pleadings, where affidavits or other materials show that no genuine issue of material fact exists. *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Plaintiff first alleges that the conduct, representations, actions, and promises of the Board of Publications, during the period when COH placed advertisements in *The Banner* (1974–1980), constituted an implied in fact contract between COH and defendant Board of Publication. Plaintiff contends that this "contract" granted COH the right to have advertisements for promissory notes published in *The Banner* as long as COH was affiliated with the defendant National Christian Reformed Church.

An implied in fact contract arises under circumstances which show a mutual intention to contract. *In re Munro's Estate,* 296 Mich. 80, 295 N.W. 567 (1941). A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but instead must be gathered by implication or proper deduction from the conduct, language used, or things done by them, or other pertinent circumstances attending the transaction. *Miller v. Stevens,* 224 Mich. 626, 195 N.W. 481 (1923); *Erickson v. Goodell Oil Co., Inc.,* 384 Mich. 207, 208, 180 N.W.2d 798 (1970).

In this case, plaintiff points generally to the historic dealings between itself and *The Banner* as giving rise to an implied contract obligating *The Banner* to publish its ads. Plaintiff, however, has not provided any support for this contention. Plaintiff does not cite any facts showing a mutual intention on the part of COH or the Board to contract, other than on a per advertisement basis. The "conduct, mutual assent, promises, representations, and meeting of the minds," alleged in plaintiff's complaint as the basis for its long term implied contract have not been substantiated. As already noted, conclusory allegations which do not state facts in detail and with precision are insufficient to prevent the award of summary judgment. *Robin Const. Co. v. U.S.,* 345 F.2d 610 (3rd Cir. 1965).

Other than plaintiff's general allegation that a long term contract should be implied here, the only evidence offered by the

plaintiff in support of his claim are Rev. Haan's beliefs that a contract existed between COH and *The Banner* regarding the placement of promissory note ads in that magazine, that other local churches had placed ads in *The Banner,* and that COH had from time to time over a five year period placed ads in *The Banner.* Nothing submitted by the plaintiff is at all inconsistent with defendants' position that COH and *The Banner* simply entered into a number of contracts for the publication of individual promissory note advertisements.[1] There is no evidence that anyone representing the defendants ever promised or otherwise expressly or impliedly assured the Center of Hope that it had any legal right to advertise in *The Banner.* Further, plaintiff provides no evidence of any communication between the Board or any of the defendants' representatives and the Center of Hope regarding the long term placement of promissory note ads in *The Banner.* Plaintiff's claim is simply bottomed on the fact that the financing of construction of local church buildings through promissory note advertisements in *The Banner* had become popular in the Christian Reformed Church, and that advertisements submitted by the Center of Hope had always been unconditionally accepted in the past. These facts alone do not raise a genuine issue as to the existence of an implied contract for the continuing publication of COH promissory note ads in *The Banner.*[2]

■ Plaintiff's other contract or quasi-contract theories are similarly without merit. Plaintiff's second contractual theory of recovery is that of constructive contract. A constructive or quasi-contract is a contract implied in law to prevent unjust enrichment. Only if defendants received from plaintiff a benefit which it is inequita-

ble for them to retain can the plaintiff succeed on a constructive contract theory. *Hollowell v. Career Decisions, Inc.,* 100 Mich.App. 561, 568, 298 N.W.2d 915, 920 (1980). Summary judgment is proper, in this context, where plaintiff fails to offer any evidence that the defendant unjustly received any benefit from the plaintiff greater than the agreed upon exchange. *Pearson-Cook, Inc. v. Preferred Properties, Inc.,* 102 Mich.App. 168, 301 N.W.2d 842 (1981). Here, Rev. Haan admitted that all advertising submitted by COH had been fully paid for and that all paid for advertisements were published by *The Banner.* (3rd Haan Dep. 209–210, 254–255). Plaintiff offers no evidence that by publishing the COH advertisements the defendants received any benefit other than the fully paid price of the advertising.

■ Plaintiff's third contract theory stated in paragraphs 21 through 23 of the complaint, attempts to state a claim for promissory estoppel. Plaintiff argues that the continued and unconditional publication of the promissory note ads for the Center of Hope and other local churches created a "reasonable expectation" that the Board of Publications would continue to accept COH's promissory ads for publication in *The Banner.* Michigan recognizes the doctrine of promissory estoppel as an equitable remedy to enforce a promise which produced reliance or forbearance in circumstances where the promise must be enforced to avoid injustice. *Estate of Timko v. Oral Roberts,* 51 Mich.App. 662, 666, 215 N.W.2d 750, 752 (1974). The key element of promissory estoppel is obviously the promise. Though plaintiff in his complaint states that defendants made "promises and representations" to COH, plaintiff offers no concrete evidence of any specific prom-

---

**1.** Plaintiff's claim that an implied contract exists is in direct conflict with the fact that every edition of *The Banner,* at least since 1974 when COH began its promissory note advertisements, carried the following legend on the masthead page: "The views and opinions of the writers *and advertisers* herein, do not necessarily represent the position of this magazine nor of the Christian Reformed Church. All copy may be

edited, condensed *or refused* for publication...." (emphasis added).

**2.** Even were such a contract to exist, plaintiff offers no evidence to support his contention that defendants' actions in placing conditions on the future publication of COH promissory note ads was improper, or in fact would be sufficient to constitute a breach of the alleged contract.

ise or representations, express or implied, which allegedly induced reliance on the part of COH. Accordingly, plaintiff's promissory estoppel claim must fail.

Lastly, plaintiff alleges that there existed a "confidential and fiduciary relationship" between COH and defendant Board of Publications and that the Board and CRCNA breached this duty by imposing conditions on the continued publication of COH promissory note ads in *The Banner*. "A fiduciary relationship arises when one reposes faith, confidence and trust in another's judgment and advice." *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler*, 107 Mich.App. 509, 515, 309 N.W.2d 645, 648 (1981). Relief is proper when such position of influence has been acquired and abused. *Smith v. Saginaw Savings and Loan Association*, 94 Mich.App. 263, 288 N.W.2d 613, 618 (1979). There is no evidence whatsoever that a confidential or fiduciary relationship existed between COH and *The Banner*, and therefore, no genuine issue of material fact has been raised in support of the claim for breach of fiduciary duty.[3]

### III.

Plaintiff, in his second claim for relief, alleges that the defendants' actions violate § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2 (1982), and Colo.Rev.Stat. § 6–4–101 (1973). As the basis for his section 1 and state law claims,[4] plaintiff alleges that "defendants and co-conspirators combined and conspired in unreasonable restraint of interstate trade to prohibit the Center of Hope from placing any advertisements for the sale of promissory notes in *The Banner* ... or to condition any advertisements for the sale of promissory notes in *The Banner* upon terms which were unreasonable, unjustified and served no legitimate purpose which defendant did not require of other advertisers...." Plaintiff's section 2 claim is based on plaintiff's assertion that *The Banner* held a monopoly position in the market for advertisement of low interest unsecured promissory notes by local congregations. Beginning in August 1980 and continuing until February 1982, *The Banner* "misused [its] power to control the market ... by precluding Center of Hope from advertising its notes in *The Banner*", thereby preventing the COH from effectively competing in the market for the sale of such notes. (complaint paragraphs 37 & 40).

The two essential elements of any § 1 claim are: (1) a contract, combination or conspiracy, resulting in; (2) an unreasonable restraint of trade. 15 U.S.C. § 1 (1982). Because the pleadings, affidavits and other materials in the case at bar belie

---

**3.** Plaintiff's claim that *The Banner* had a duty or obligation to continue publishing its promissory note ads flies in the face of the general principle that a newspaper or magazine has a general right to decide what advertisements it will and will not accept. *Fitzgerald v. National Rifle Association*, 383 F.Supp. 162, 163 (D.N.J.1974); "Newspaper publishers may refuse to publish whether advertisements they do not desire to publish and this is true even though the newspaper in question may enjoy a virtual monopoly in the area of its publication." *Newspaper Printing Corp. v. Galbreath*, 580 S.W.2d 777, 779 (Tenn. 1979). *See Generally, Herald Co. v. Seawell*, 472 F.2d 1081, 1094–1095 (10th Cir.1972); Annot., *Right of Publisher of Newspaper or Magazine, in Absence of Contractual Obligation, to Refuse Publication of Advertisement*, 18 A.L.R.3d 1286 (1968).

**4.** Section § 6–4–101 of the Colorado Revised Statutes states in full:

*Illegal Restraint of Trade.* Every contract or combination in the nature of a trust or con-

spiracy in restraint of trade or commerce is declared illegal. Every combination, conspiracy, trust, pool, agreement, or contract intended to restrain or prevent competition in the supply or price of any article or commodity constituting a subject of trade or commerce in this state which controls in any manner the price of any such article or commodity, fixes the price thereof, or limits or fixes the amount or quantity thereof to be manufactured, produced, or sold in this state, or monopolizes or attempts to monopolize any part of the trade or commerce in this state, is declared an illegal restraint of trade.

In view of the fact that Colo.Rev.Stat. § 6–4–101 parallels § 1 of the Sherman Act, and that the federal and state statutes serve complimentary purposes, my analysis of plaintiff's § 1 claim applies equally to plaintiff's state claim. *People v. North Ave. Furn. and Appliance, Inc.*, 645 P.2d 1291 (Colo.1982).

the existence of the first essential element, only it need be considered here.

■ It is clear that § 1 of the Sherman Act reaches unreasonable restraints of trade effected by a "contract, combination or ... conspiracy" *only* between separate entities, and it does not reach conduct that is wholly unilateral. *Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Here, the defendants who allegedly conspired, the Christian Reformed Church of North America, Inc. and the Board of Publications of the Christian Reformed Church, Inc., do not operate as separate entities; and therefore, are not capable, *as a matter of law*, of conspiring under § 1 of the Sherman Act. As a religious denomination, the Christian Reformed Church of North America (CRCNA) is organized into a number of boards and agencies, one of which is the defendant Board of Publications (Board). The various branches or "classes" of the denomination appoint the members of the Board of Publications and the governing body of the CRCNA ("the Synod") appoints the editors. The Board is thus a division or subsidiary of defendant CRCNA.[5] Because the Board and CRCNA are considered a single entity, the activities of which plaintiff complains cannot violate § 1.

■ Plaintiff's allegations are not cognizable under § 2 of the Sherman Act as well. Although a summary judgment motion dismissing antitrust claims is not generally to be granted, the motion may be granted when the allegedly unlawful practice does not exist and it is plain that plaintiff's claim is without merit. *Hartford v. Olsten Corp.*, 506 F.2d 658 (2d. Cir.1974). To allege that a religious denomination, whose church publication acting out of concern for the readers of its church publication and its own credibility, violates § 2 of the Sherman Act by conditioning future sales of promissory note advertising space upon receipt of satisfactory assurances of financial stability of a local congregation is patently ludicrous.

Regardless of whether defendants hold a monopoly position, the Sherman Act is not aimed at reasonable conduct. It is simply not unreasonable for a newspaper or magazine to refuse advertising on the ground that it might be misleading to its readers. *Homefinders of America, Inc. v. Providence Journal Co.*, 621 F.2d 441 (1st Cir. 1980). In the case at bar, the record clearly shows that defendants acted reasonably when they asked for assurances of plaintiff's financial stability before continuing to publish COH advertisements. Even with the benefit of substantial discovery, plaintiff can portend no support for his contention that defendants acted other than out of legitimate "business" concern. In fact, plaintiff admits that the form of fund raising COH was engaged in is of questionable legality under the federal securities laws.[6] In light of the First Amendment and the reasonable business justification articulated by defendants, there is no question that the antitrust laws were not intended, and

---

**5.** Whether organized as parent and subsidiary, or into divisions, for purposes of § 1 of the Sherman Act, the alleged coordinated actions of the Board and CRCNA must be viewed as that of a single enterprise. *Copperweld Corp. v. Independence Tool Corp., supra*, at 2742. Nor does it matter that the Board and CRCNA are separately incorporated. Substance not form determines whether a separately incorporated entity is capable of conspiring in violation of the Sherman Act. *Copperweld Corp. v. Independence Tool Corp., supra* at 2743.

**6.** (3rd Haan depo. 19–20, 25–26). Further, solicitation of promissory notes through newspaper advertisements has since been declared to run afoul of the Michigan securities statutes. On October 19, 1983, the Michigan Department of Commerce, Corporation & Securities Bureau issued to plaintiff a "Final Order to Cease and Desist and to Revoke and Deny Exemptions Pursuant to the Michigan Uniform Securities Act." The Bureau determined that publishing promissory note advertisements in *The Banner* violated § 301 of the Michigan Uniform Securities Act by offering and selling unregistered, nonexempt securities within Michigan. Publication of promissory note ads in *The Banner* by the plaintiff was also found to violate § 101(2) of the Michigan Act by omitting to state a material fact in connection with the offer and sale of securities with Michigan.

cannot be used to compel *The Banner* to publish advertising against its will.

## IV.

 Plaintiff's third claim for relief involves the publication by defendants Board of Publications, Vander Zicht, and Kuyvenhoven of an allegedly defamatory article about COH and its affiliates. Under Colorado conflict of law rules, the law to be applied in a libel action is that of the state having the most significant relation with the parties in communication. *First National Bank of Fort Collins v. Rostek, supra.* In defamation cases this is usually the state of the plaintiff's domicile. *Hanley v. Tribune Publishing Co.*, 527 F.2d 68 (9th Cir.1975). In this case the allegedly defamatory article, though printed in Michigan, was "published" in Colorado; *The Banner* was distributed in Colorado; the subjects of the article, COH and its affiliated organizations, are Colorado residents; and the harm allegedly suffered by COH, et al., was suffered in Colorado. In light of these factors and Colorado's important interest in protecting its citizens from defamation, it is clear that Colorado bears the most significant relationship to plaintiff's claim of defamation; and thus, Colorado law applies here.

 Despite the fact that summary judgment is a drastic remedy, *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir.1973), the Colorado and federal courts have found summary judgment to be particularly appropriate in defamation actions. *See, Manuel v. Fort Collins Newspaper, Inc.*, 42 Colo.App. 324, 599 P.2d 931, 934 (1979) *rev'd on other grounds*, 631 P.2d 1114 (1980); *Walters v. Linhof*, 559 F.Supp. 1231 (D.Colo.1983). This is especially true in cases such as this, where the *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), standard of proof applies.[7] In such cases, to survive a motion for summary judgment, plaintiff must come forth with strong evidence that the defendant knew the statements published were false or that the defendant had reckless disregard of whether they were true or false. *DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318, 321 (1980). Otherwise, if plaintiff is allowed to escape summary judgment by simply a minimal showing, the threat of protracted litigation might have a "chilling effect" on the full and free exercise of the First Amendment. *Manuel v. Fort Collins Newspaper, supra.*

 In a defamation action, under Colorado law, the *New York Times* standard of proof is to be applied in all cases involving a media defendant and, where: (1) plaintiff is a public figure; or (2) plaintiff is a public official; or (3) plaintiff is a private individual and the case involves matters of public interest or general concern. *Diversified Management v. Denver Post, Inc.*, 653 P.2d 1103 (Colo.1982). The *New York Times* standard requires plaintiff prove by a preponderance that defendant published the allegedly defamatory statements, and that the statements caused the plaintiff actual damages. Further, plaintiff must prove by clear and convincing evidence that the substance or "gist" of the statement was false at the time it was published and that it was made with actual malice. In this context "malice" means the defendant either knew that the statements were false or they were made with reckless disregard as to whether they were false. Lastly, under *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), and *Diversified Management, supra*, in all three types of cases, proof that defendants acted with reckless disregard for whether a statement is true, requires a showing by clear and convincing evidence that defendants entertained serious doubts about the truth of its publication.

Because I conclude in this case that the material alleged to be defamatory involves matters of public or general concern, the more difficult question of whether the Center of Hope and its three affiliates can be

---

**7.** For the reasons stated below, I conclude that the *New York Times v. Sullivan, supra,* and its progeny, are applicable in this case. This standard of proof applies equally at the summary judgment stage of the judicial proceedings. *DiLeo v. Koltnow, supra.*

considered to be "public figures" need not be addressed.[8]

The question of whether the activities in the present case are a "matter of public interest and general concern," is one for the court. *Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450, 459 (1975). While the Colorado Supreme Court in *Diversified Management v. Denver Post, supra,* declined to precisely define the terms "public or general concern," it did find the activities in that case within the scope of the terms. In that case, the activities which were the subject of the two *Denver Post* articles complained of, were alleged widespread and ongoing land development schemes of questionable propriety. In finding that the matter was of "public or general concern," the court focused on the fact that the public had an abiding interest in the matter. The court noted that since the project was an ongoing one, and all the lots were not yet sold, the public contained a number of potential buyers. It held that the interest of these unknown potential buyers was sufficient to bring the case within the bounds of "matters of public or general concern."

As in *Diversified Management,* the matters involved in the present case which form the basis of *The Banner's* February 8, 1982 article involved financial schemes of questionable propriety; specifically the offering of unsecured promissory notes for sale in *The Banner.* Further, thousands of *The Banner's* readers invested millions of dollars in promissory notes with COH or its affiliates. As investors, they had a continuing and tangible stake in COH's financial stability and well being. Such an abiding financial interest clearly makes the matter one of "public or general concern." *Diversified Management v. Denver Post, supra.*

Application of the law, as set out above, to the facts of this case requires a determination of whether, in fact, the statements complained of are capable of bearing a defamatory meaning and whether plaintiff has offered sufficient evidence on the issue of actual malice in order to meet the *New York Times* standard of proof. In the present case, defendants argue that the statements made in the February 8, 1982 *Banner* article are not defamatory as a matter of law. Plaintiff, in his complaint, alleges that *The Banner* article contains numerous references to the Center of Hope and its agents which are defamatory and false. More specifically, plaintiff alleges that the article falsely communicated to *Banner* readers that COH was insolvent and in a position of financial embarrassment caused by fraud, dishonesty, and inept management on the part of COH and its agents.

*The Banner* article is entitled "Former CRC Complex in Trouble: Investors Fear Collapse of Center of Hope, Denver, Colorado." *The Banner* article, authored by reporter Sandra Vander Zicht, seeks to provide *The Banner* readers with a financial history of the Center of Hope and its affiliates, and the history of COH's connection with the National Church (CRCNA).

In this jurisdiction, a publication is considered defamatory if it impeaches the honesty, integrity, or reputation of the plaintiff and thereby exposes him to public hatred, contempt or ridicule. *Knapp v. Post Printing and Publishing Co.,* 111 Colo. 492, 144 P.2d 981 (1943). Both an individual and a corporation or other business entity are capable of being defamed. The question of whether a communication is capable of bearing a defamatory meaning is a legal issue to be decided by the court. *Walters v. Linhof, supra* at 1236.

After a careful review of the article, and with the foregoing standard in mind, I conclude without reservation that the February 8, 1982 article and the statements within it, are not susceptible, as a matter of law, of a defamatory meaning.

---

**8.** In Colorado, where defendant is a member of the media and matters of public and general concern are involved, the *New York Times* standard controls whether or not the allegedly defamed parties are public figures.

Plaintiff has not offered any evidence that the "gist" or "sting" of *The Banner* article, *read as a whole*, is untrue. *Gomba v. McLaughlin*, 180 Colo. 232, 237, 504 P.2d 337 (1972). Plaintiff's efforts in this regard consist solely of attempts to conjure up a defamatory meaning by pulling individual words or phrases out of the article's context. This approach is unpersuasive and contrary to the law as set out above. Further, when read in their entirety and in their ordinary meaning, the statements in the article which are alleged to be defamatory, do not hold COH and its affiliates up to hatred, contempt or ridicule.[9]

Even if I were to determine that the statements in *The Banner* article are defamatory, I would find that plaintiff has not offered any evidence whatsoever of actual malice or reckless disregard on the part of the defendants in preparing the February 8, 1982 article, and therefore, plaintiff could not, as a matter of law, meet the *New York Times* standard of proof as outlined above. Conversely, defendants, through the affidavit of reporter Sandra Vander Zicht, as well as numerous supporting depositions and exhibits, have clearly established that they conducted as extensive an investigation as was reasonable under the circumstances, and made a sincere effort to interview Haan to obtain his views prior to publication.[10] Further, it is clear from these materials that virtually every statement in the article was supported by one or more sources and that the reporting was limited to the mainstream of the factual flow which developed from the reporter's inquiries. Defendants were not obligated to do more.

Upon the foregoing, it is

ORDERED plaintiff's fourth claim for relief is dismissed as to all defendants.

FURTHER ORDERED defendants' motion for summary judgment is granted. The Clerk shall enter judgment in favor of defendants and against plaintiff on all claims in plaintiff's complaint. Defendants shall have their costs upon the filing of a bill of costs within ten days of entry of judgment.

FURTHER ORDERED plaintiff's motion to file briefs in excess of the 10 page limit is granted.

FURTHER ORDERED defendants' motion to file a reply brief is granted.

---

**9.** Further, the Haan depositions submitted in this case indicate that Haan has admitted the truth of many, if not most, of the statements made in the *Banner* article.

**10.** Sandra Vander Zicht, in paragraph 21 of her affidavit, states that she was in Denver as part of her investigation in late January 1982. She phoned Haan and "spoke very briefly with him."

The Haan-Vander Zicht conversation was transcribed and submitted with defendants' brief in support of their motion for summary judgment. (G.R. Ex. 84). This exhibit makes clear that Vander Zicht informed Haan of the planned article, and offered Haan an opportunity to give his side of the story. Haan responded, "I don't have anything to say."